**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KENNETH N. AYER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LIGHTSTONE VALUE PLUS REIT I, INC., *et al.*, <br><br> Defendants. | Civil Action No. 24-10371 (MAS) (TJB) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

      This matter comes before the Court upon Defendants Lightstone Value Plus REIT I, Inc.; Lightstone Value Plus REIT LLC; Lightstone Value Plus REIT II, Inc.; Lightstone Value Plus REIT II LLC; Lightstone Value Plus REIT III, Inc.; Lightstone Value Plus REIT III LLC; Yehuda I. Angster; Howard E. Friedman; David Lichtenstein; Alan Retkinski; and George R. Whittemore's (collectively, "Defendants") Motion to Dismiss (ECF No. 7) Plaintiffs Kenneth N. Ayer, Martha Harvey, and Larry Melton's (collectively, "Plaintiffs") Class Action Complaint ("CAC") (ECF No. 1). Plaintiffs opposed (ECF No. 10), and Defendants replied (ECF No. 11). After careful consideration of the parties' submissions, the Court decides Defendants' motion without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons outlined below, Defendants' Motion to Dismiss is granted.

I.     **BACKGROUND**[1]

A.     **Parties**

This matter is a putative class action brought on behalf of Plaintiffs and "all other similarly situated investors who own illiquid shares of common stock of Lightstone Value Plus REIT I ("REIT I"), Lightstone Value Plus REIT II ("REIT II"), and Lightstone Value Plus REIT III ("REIT III") (collectively, the "Lightstone REITs"). (CAC ¶ 1, ECF No. 1.) Plaintiff Martha Harvey held common shares of REIT I, Plaintiff Kenneth N. Ayer held common shares of REIT II, and Plaintiff Larry Melton held common shares of REIT III at all relevant times. (*Id.* ¶ 8.)

The Lightstone REITS are each incorporated in Maryland and have their principal place of business in New Jersey. (*Id.* ¶¶ 9, 11, 13.) Defendant Lightstone Value Plus REIT LLC is the external advisor to REIT I under an Advisory Agreement dated April 22, 2005. (*Id.* ¶ 10.) Defendant Lightstone Value Plus REIT II LLC is the external advisor to REIT II under an Advisory Agreement dated February 17, 2009. (*Id.* ¶ 12.) Defendant Lightstone Value Plus REIT III LLC is the external advisor to REIT III under an Advisory Agreement dated July 16, 2014. (*Id.* ¶ 14.) Defendants Lightstone Value Plus REIT LLC, Lightstone Value Plus REIT II LLC, and Lightstone Value Plus REIT III LLC are herein collectively referred to as the "Lightstone Advisors."

Defendant David Lichtenstein ("Lichtenstein") has been the Chairman and Chief Executive Officer of REITS I, II, and III since 2004, 2008, and 2012, respectively. (*Id.* ¶ 17.) He also owns and controls the Lightstone Advisors. (*Id.*) Defendant Yehuda I. Angster ("Angster") was a director of REIT I from 2015 to 2021, REIT II from 2021 to present, and REIT III from 2015 to present. (*Id.* ¶ 15.) Defendant Howard E. Friedman ("Friedman") has been a director of REIT I from 2021

---

[1] For the purpose of considering the instant motion, the Court accepts all factual allegations in the CAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

to present. (*Id.* ¶ 16.) Defendant Alan Retkinski ("Retkinski") has been a director of REIT I from 2019 to the present. (*Id.* ¶ 18.) Defendant George R. Whittemore ("Whittemore," and collectively with Lichtenstein, Angster, Friedman, and Retkinski, the "Director Defendants") has been a director of REIT I since 2006, REIT II since 2008, and REIT III since 2013. (*Id.* ¶ 19.)

### B.     Non-Traded REITs

In 1988, Lichtenstein formed the Lightstone Group, which is "reportedly one of the largest privately-held real estate companies in the United States." (*Id.* ¶ 20.) The Lightstone Group sponsors and sells non-traded REITs, such as the Lightstone REITs. (*Id.* ¶ 21.) Non-traded REITs are illiquid investments because they are not traded on a public national securities exchange. (*Id.* ¶ 22.) They do, however, need to be registered with state securities regulators and the Securities and Exchange Commission ("SEC"), as well as file periodic regulatory filings with the SEC. (*Id.* ¶ 23.) To maintain REIT status for tax purposes, non-traded REITs must distribute at least 90 percent of their taxable income to shareholders. (*Id.* ¶ 23.) Non-traded REITs also generally have a high fee and commission structure, typically ranging between 7-10 percent of capital, and pay annual fees to an advisory entity. (*Id.* ¶ 27.) In general, investors in non-traded REITs must wait until a "liquidity event" to sell their investments, which normally happens when the "sponsor lists [the REIT's] shares on a public securities exchange or enters into a merger." (*Id.* ¶ 25.)

### C.     The Legacy Charters

As of late 2022, each Lightstone REIT contained certain investor protections as outlined in their respective original charters (the "Legacy Charters").[2] Each Legacy Charter permitted any shareholder to "inspect [the Lightstone REIT's] shareholder list, or receive a copy of same by mail

---

[2] The CAC alleges that these investor protections are consistent with the North American Securities Administrators Association ("NASAA") Statement of Policy Regarding Real Estate Investment Trusts, commonly referred to as the "NASAA REIT Guidelines." (CAC ¶ 28.)

upon request." (CAC ¶¶ 37, 41, 44.) They also "contained limitations on indemnification of Directors and officers and limitations on roll-up transactions consistent with the limitations in the NASAA REIT Guidelines." (*Id.* ¶¶ 37, 41, 44.) Certain fiduciary duties were outlined in each Legacy Charter: "[t]he Directors serve in a fiduciary capacity to the Company and have a fiduciary duty to the Stockholders, including a specific fiduciary duty to supervise the relationship of the Company with the Advisor."[3] (*Id.* ¶¶ 41, 44.) Each Legacy Charter also initially contained a duration provision that provided that if a listing did not occur before the tenth (for REITs I and II) or the eighth (REIT III) anniversary of the termination of the initial public offering, then the Board must either: (1) "adopt a resolution that sets forth a proposed amendment to the Charter extending or eliminating this deadline" (the "Extension Amendment"); or (2) "adopt a resolution that declares that a proposed liquidation of the Company is advisable on substantially the terms and conditions set forth in, or referred to, in the resolution" (the "Plan of Liquidation"). (*Id.* ¶¶ 42, 45; *see id.* ¶ 38.) Based on this language, the Lightstone REITs were required to undertake either an Extension Amendment or a Plan of Liquidation by the dates in the chart below:

| Lightstone REIT | Termination of the Initial Public Offering | Plan of Liquidation or Extension Amendment Date |
|---|---|---|
| REIT I | 2008 | October 10, 2018[4] |
| REIT II | 2014 | September 20, 2024 |
| REIT III | 2017 | March 31, 2025 |

(*Id.* ¶¶ 25-26, 39, 43, 46.)

---

[3] REIT I's fiduciary duty obligation had slightly different language from REITs II and III: "[t]he Directors and the Advisor serve in a fiduciary capacity of the Company and have a fiduciary duty to the Stockholders of the Company, including, with respect to the Directors, a specific fiduciary duty to supervise the relationship of the Company with the Advisor." (CAC ¶ 37.)

[4] REIT I shareholders approved an amendment to the Legacy Charter on October 5, 2018, which eliminated the requirement for a Plan of Liquidation or Extension Amendment by a certain date. (CAC ¶ 40.)

Lichtenstein also holds equity investments in the Lightstone REITs (the "Subordinated Participation Interests") that receive money only if each of the common shares has received a "cumulative, pre-tax non-compounded return over and above the initial offering price of $10.00 a share." (*Id.* ¶¶ 31-32.) REITs I and II require a cumulative, pre-tax, non-compounded return of 7 percent and REIT III requires a cumulative, pre-tax, non-compounded return of 6 percent. (*Id.* ¶¶ 32-35.)

### D.    2023 Charter Amendments

In late 2022, the Lightstone Group announced that it was seeking shareholder approval for amendments to each of the Legacy Charters of the Lightstone REITs (the "2023 Charter Amendments"). (*Id.* ¶ 47.) The 2023 Charter Amendments proposed to: (1) eliminate the duration requirements for REITs I and II; (2) "[e]liminat[e] fiduciary duties that the boards owe[d] to the Lightstone REITs and shareholders and the directors' fiduciary duties to supervise the relationships of the Lightstone REITs and their external advisors"; (3) "eliminat[e] . . . certain protections in the event of a roll-up transaction, including appraisal rights for shareholders, and the ability to retain securities in their previous entity or receive cash in lieu of securities in another entity"; (4) "eliminat[e] quorum requirements of at least 50% of all votes entitled to be cast at a stockholder meeting, and permit[] reduction of the votes required for quorum to as little as 33% of votes entitled to be cast"; (5) "replac[e] provisions permitting any shareholder to receive a shareholder list for non-commercial purposes with a requirement that, to receive a copy of the shareholder list, a shareholder must have owned 5% of the outstanding stock of any class of shares for six months or more"; and (6) "expand[] each REIT's ability to exculpate and indemnify officers and directors, and advance defense expenses in the case of litigation, to the maximum exten[t] permitted by Maryland law." (*Id.* ¶¶ 47-48.)

REIT I shareholders passed the 2023 Charter Amendments on December 8, 2022, and they became effective just under two weeks later on December 21, 2022. (*Id.* ¶ 63.) REITs II and III shareholders failed to pass the 2023 Charter Amendments due to insufficient votes cast on December 8, 2022, but they both passed the amendments on January 17, 2023, when they reconvened their respective annual meetings. (*Id.* ¶¶ 64-65.) The 2023 Charter Amendments became effective as to REIT II on January 19, 2023, and effective as to REIT III on January 26, 2023. (*Id.*)

E.    **The Allegedly False and Misleading Proxy Statements**

Plaintiffs allege that Defendants filed "materially incomplete and misleading" proxy statements and "frequently asked questions" ("FAQ") documents with the SEC in connection with the 2023 Charter Amendments for each Lightstone REIT. (*Id.* ¶ 49.) Specifically, as to REIT I, Plaintiffs point to a proxy statement on Form DEF14A filed on October 18, 2022 (the "2022 REIT I Proxy") and a supplemental FAQ proxy statement on Form DEFA14A on November 9, 2022 (the "2022 REIT I FAQs"). (*Id.* ¶ 50.) As to REIT II, Plaintiffs point to a proxy statement that Defendants filed on Form DEF14A on October 18, 2022 (the "2022 REIT II Proxy") and a supplemental FAQ proxy statement on Form DEFA14A on November 14, 2022 (the "2022 REIT II FAQs"). (*Id.*) As to REIT III, Plaintiffs point to a proxy statement that Defendants filed on Form DEF14A on October 18, 2022 (the "2022 REIT III Proxy," and together with the 2022 REIT I Proxy and the 2022 REIT II Proxy, the "2022 Proxy Statements") and a supplemental FAQ proxy statement on Form DEFA14A on November 15, 2022 (the "2022 REIT III FAQs," and together with the 2022 REIT I FAQs and the 2022 REIT II FAQs, the "2022 FAQs"). (*Id.*)

The 2022 REIT II Proxy, 2022 REIT II FAQs, 2022 REIT III Proxy, and 2022 REIT III FAQs included the following reasons for eliminating the duration requirements for REIT II:

> Our Board of Directors has determined that it is in the best interest
> of the Company and its stockholders to amend the [Legacy] Charter
> to eliminate the deadline to liquidate and dissolve the Company (the
> "Elimination Amendment") at this time. Doing so will allow us to
> engage in transactions that may be beneficial to us and our
> stockholders and will provide us more flexibility in pursuing various
> ways to provide liquidity to our stockholders. If the Elimination
> Amendment is approved, management will review the Company's
> liquidity requirements on an ongoing basis, to seek out beneficial
> transactions, including acquisitions and sales, or dispositions, that
> could increase the liquidity used to pay dividends or otherwise.

(*Id.* ¶¶ 54-55, 57-58.) Plaintiffs allege that these statements were materially false and misleading

because Defendants failed to disclose that the "true reason" for eliminating the said deadline was

"to avoid a liquidation or other liquidity event at a time and under circumstances when"

Lichtenstein's $17.7 million indirect investments in the Subordinated Participation Interests in

REIT II and $12.1 million indirect investments in the Subordinated Participation Interests in REIT

III would have been worthless.[5] (*Id.* ¶¶ 56, 59.)

Plaintiffs allege that the 2022 Proxy Statements and 2022 FAQs were materially false and

misleading because they failed to disclose that substantial factors in Defendants' decision to

recommend the 2023 Charter Amendments were not only so that Lichtenstein could try to monetize

his Subordinated Participation Interests, but also so that the Lightstone Advisors could continue to

collect advisory fees indefinitely. (*Id.* ¶ 60.) In 2022, the Lightstone REITs paid the following

advisory fees to their respective Lightstone Advisors: REIT I, $5.9 million; REIT II, $2.7 million;

and REIT III, $1.2 million. (*Id.* ¶ 27.) Plaintiffs further allege that the 2022 Proxy Statements and

2022 FAQs were materially false and misleading because they failed to disclose Lichtenstein's

conflict of interest, as explained above. (*Id.* ¶ 61.) Plaintiffs allege that as a result of these

---

[5] Plaintiffs also allege that the 2022 REIT II Proxy and 2022 REIT II FAQs were false because the actual date by which REIT II had to effectuate an Extension Amendment or Plan of Liquidation was September 20, 2024, and not March 31, 2025, as stated in both the 2022 REIT II Proxy and 2022 REIT II FAQs. (CAC ¶ 56.)

purportedly materially false and misleading statements, the Lightstone REITs' shareholders were not able to cast informed votes because they were not able to fully understand the reasoning behind or the implications of the 2023 Charter Amendments. (*Id.* ¶ 62.)

### F.    Post-2023 Charter Amendments

The Lightstone REITs paid over $7 million in advisory fees to the Lightstone Advisors in 2023. (*Id.* ¶ 66.) In March 2024, the board of directors approved the following net asset values ("NAV") of each Lightstone REIT: $11.73/share for REIT I; $9.84/share for REIT II; and $9.93/share for REIT III. (*Id.* ¶¶ 67-69.) Plaintiffs allege, however, that the Lightstone REITs were reportedly bought and sold in online secondary markets in 2024 for the following prices: $5.50/share for REIT I; $3.20/share for REIT II; and $5.25/share for REIT III. (*Id.* ¶ 70.) Plaintiffs point to this discrepancy and allege that the Lightstone REITs are actually worth much less than their approved NAVs "due to illiquidity and the elimination of the duration provision." (*Id.*) Plaintiffs also allege that because Defendants have taken no steps towards a liquidity event since the 2023 Charter Amendments, Plaintiffs have effectively become permanent investors in the Lightstone REITs. (*Id.* ¶¶ 71-72.)

### G.    Procedural Background

Plaintiffs initially brought this case in the Law Division of the New Jersey Superior Court, Ocean County, New Jersey, and Defendant removed the case to this Court. (ECF No. 1.) The Complaint includes four causes of action: (1) breach of fiduciary duties against the Director Defendants in their capacities as Directors ("Count One"); (2) breach of fiduciary duties against the Lightstone Advisors ("Count Two"); declaratory relief pursuant to the Courts and Judicial Proceedings Article of the Annotated Code of Maryland § 3-401, *et seq*. ("Count Three"); and (4) breach of contract against all Defendants ("Count Four"). (CAC ¶¶ 80-111.)

On January 6, 2025, Defendants filed the instant Motion to Dismiss. (Defs.' Moving Br., ECF No. 7-1.) Plaintiffs opposed (Pls.' Opp'n Br., ECF No. 10), and Defendants replied (Defs.' Reply Br., ECF No. 11).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure[6] 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no

---

[6] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**III.    DISCUSSION**

      Defendants make five arguments in support of dismissing the CAC: (1) Plaintiffs have alleged derivative claims that require a pre-suit demand on the Lightstone REITs' boards; (2) the 2023 Charter Amendments were ratified by a majority of disinterested, informed stockholders; (3) Plaintiffs fail to overcome the business judgment rule; (4) the alleged breaches of contract in Count Four were allowed by the Legacy Charters; and (5) Lightstone Value Plus REIT III must be dismissed as a defendant because it owed no fiduciary duty to Plaintiffs as an advisor entity. (*See generally* Defs.' Moving Br.) The Court addresses each argument in turn.

      **A.    Direct Versus Derivative Claims**

      Defendants argue that the CAC should be dismissed because all claims are derivative, and Plaintiffs did not make a demand on the Lightstone REITs' boards or otherwise allege that demand would be futile. (Defs.' Moving Br. 9-15.) Specifically, Defendants argue that the nature of the wrongs predominately relate to the Lightstone REITs, and the main form of relief that Plaintiffs seek is damages related to depreciation in stock value that would flow to the Lightstone REITs. (*Id.* at 11-14.) Plaintiffs argue in opposition that the claims are direct because Plaintiffs have suffered an injury that is distinct from the Lightstone REITs based on a breach of fiduciary duty to the shareholders themselves. (Pls.' Opp'n Br. 17-25.)

      "[R]egardless of the 'label the plaintiff gives' the suit, a court must look to the nature of the action as set forth in the complaint to determine whether it is derivative or direct." *Bluefeld v. Cohen*, No. 15-2857, 2017 WL 1546406, at *3 (D. Md. Apr. 27, 2017), *aff'd*, 697 F. App'x 788 (4th Cir. 2017). "Under Maryland law, whether a claim . . . is direct or derivative in nature depends

on[:] (1) the nature of the wrong alleged[;] and (2) the relief sought." *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 39 (2d Cir. 2020) (citing *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 424-25 (Md. App. Ct. 2009)).

First, when considering the alleged wrong, "claims are direct if the shareholders' injury is distinct from the injury suffered by the corporation." *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 462 (D.N.J. 2005) (citing *Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (applying Maryland state law)). In contrast, a derivative claim arises where "the corporation is injured and the injury to its shareholders derives from that injury." *Strougo*, 282 F.3d at 171; *Bluefeld*, 2017 WL 1546406, at *3 ("A derivative suit is a cause of action that belongs to the corporation." (citation modified)). In pursuing a derivative claim, the plaintiff is, in effect, alleging that a wrong has been done upon the corporation, and as such, the corporation is "the real party in interest." *Laios v. MTM Builder/Dev., Inc.*, No. 20-3337, 2021 WL 4478712, at *4 (D. Md. Sep. 30, 2021) (citation omitted).

Second, when considering the relief sought, a claim is direct when "[t]he remedy that a shareholder seeks . . . benefit[s] the shareholder as an individual, not the corporate entity." *Oliveira v. Sugarman*, 152 A.3d 728, 742 (Md. 2017). Notably, while the injury to shareholders must be distinct from that of the corporation, the injury among shareholders may be undifferentiated. *See Strougo*, 282 F.3d at 171 (explaining that "a shareholder must allege an injury distinct from an injury to the corporation, not from that of other shareholders"). On the other hand, a claim is derivative when the relief sought is to the benefit of the injured corporation. *See id.*

To bring a derivative claim, "a plaintiff shareholder must overcome a number of procedural hurdles and demonstrate that he or she, rather than the corporation itself, should control the litigation." *Shenker*, 983 A.2d at 423. Before initiating a derivative suit, the plaintiff "must either

11

make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile." *Bender v. Schwartz*, 917 A.2d 142, 152 (Md. App. Ct. 2007) (citations omitted). If the corporation "fails to take the action requested by the shareholder(s) (i.e., to bring the suit), the shareholder(s) may bring a 'demand refused' [derivative] action." *Id.* If a plaintiff's claims are improperly plead as direct claims, but are derivative claims that require the aforementioned procedure, such claims will be dismissed. *See, e.g.*, *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d at 464 (dismissing certain claims that the court determined were improperly plead as direct claims). Here, Plaintiffs do not allege that they made any demand on the board of directors of the Lightstone REITs or that such demand would have been futile. (*See generally* CAC.) As such, if the Court finds that any claim is derivative, the Court must dismiss that claim.

Here, Count One alleges breaches of fiduciary duties against the Director Defendants. (CAC ¶¶ 80-87.) Plaintiffs allege that the Director Defendants' fiduciary duties required them to:

> (a) act independently to protect the interests of the Lightstone REITs' public stockholders; (b) adequately ensure that no conflicts of interest exist[ed] between the Director Defendants' own interests and their fiduciary obligations, and, if such conflicts existed, to ensure that all conflicts were resolved in the best interests of the Lightstone REITs' public stockholders rather than the Director Defendants' own interests of [sic] those of insiders such as . . . Lichtenstein; (c) take reasonable steps to achieve liquidity for the shareholders of the Lightstone REITs as required under their Legacy Charters; (d) ensure that all communications with shareholders, including without limitation the 2022 Proxy [S]tatements and the 2022 FAQs, were accurate, complete and truthful; and (e) make recommendations to Plaintiffs and the Class that were based on a good faith assessment of the best interests of such shareholders.

(*Id.* ¶ 82.) Plaintiffs further allege that the Director Defendants breached these duties by recommending the 2023 Charter Amendments even though they were not in the shareholders' best interests and by disseminating the "false, misleading[,] and/or incomplete" 2022 Proxy Statements and the 2022 FAQs. (*Id.* ¶ 83.) As a result of these actions, Plaintiffs allege that they:

(a) have not and will not be able to liquidate their shares for fair value; (b) have been deprived of valuable rights via the 2023 Charter Amendments; (c) did not receive all material information necessary to vote on the 2023 Charter Amendments[;] and (d) have suffered and continue to suffer a diminution in the value of their shares.

(*Id.* ¶ 87.)

First, as to the nature of the wrongs, Defendants argue that "the wrongs alleged predominantly relate to purported harm to the Lightstone REITs" because "Plaintiffs have claimed, for example, that actions taken by the [Director Defendants] materially changed the structures of the individual REITs, which resulted in the value of their stock declining." (Defs.' Moving Br. 11.) Defendants also point to Plaintiffs' allegations that "'Defendants have simply allowed the Lightstone REITs to languish' and have improperly allowed the [Lightstone] Advisors to collect over '7 million in fees' with 'no end in sight.'" (*Id.* at 12 (citing CAC ¶ 66).) Defendants, however, mischaracterize the nature of the wrongs that Plaintiffs allege. In effect, Plaintiffs allege that the Director Defendants' actions "unfairly deprived [them] of their ability to make intelligent and informed decisions" about the 2023 Charter Amendments vote. (CAC ¶ 85.)

As an initial matter, the Court notes that "Maryland courts have clearly established the proposition that directors and officers owe fiduciary duties to both the corporation *and* the shareholders." *Strougo*, 282 F.3d at 173. In 2016, the Maryland Legislature clarified that Section 2-405.1 of the Maryland Code, Corporations and Associations, is "the sole source of duties of a director to the corporation *or [to] the stockholders of the corporation*."[7] Md. Code Ann., Corps. & Ass'ns § 2-405.1(i)(1) "Cases where direct harm is suffered by shareholders include . . . actions to enforce a shareholder's right to vote." *Shenker*, 983 A.2d at 345.

_____

[7] Those duties require directors to act: (1) "[i]n good faith"; (2) "[i]n a manner the director reasonably believes to be in the best interests of the corporation"; and (3) "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." Md. Code Ann., Corps. & Ass'ns § 2-405.1(c).

The Court also finds cases from Delaware instructive on this issue. *See Oliveira*, 152 A.3d at 746 (noting that "Delaware cases evaluating whether the harm of an uninformed vote supports a direct claim generally are instructive" where Maryland law applies); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d at 463 n.8 (noting that the laws of Maryland and Delaware "do not materially differ . . . when distinguishing between direct and derivative claims"). The Delaware Supreme Court has held that "where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006). Here, Plaintiffs allege that the Director Defendants' breach of fiduciary duties caused them to make an uninformed vote, and that the results of the vote prevented Plaintiffs from liquidating their individual shares. (CAC ¶ 87.) The shareholders were therefore allegedly harmed directly because they were precluded from making a fully informed vote on the 2023 Charter Amendments. *See In re Ebix, Inc. S'holder Litig.*, No. 8526, 2014 WL 3696655, at *16 (Del. Ch. July 24, 2014) (finding that disclosure-based fiduciary duty claims alleging that defendants made material misstatements in proxy statements and deprived plaintiff of the ability to cast an informed vote was a direct claim under Delaware law).

Second, as to the relief sought, Plaintiffs seek: (1) to rescind and unwind the 2023 Charter Amendments; (2) a "[d]eclar[ation] that the Director Defendants breached their fiduciary duties to Plaintiffs and the Class"; (3) a "[d]eclar[ation] that Defendants breached the terms of the Legacy Charters and violated the implied duty of good faith and fair dealing"; (4) an award of "compensatory damages . . . for all losses and damages suffered as a result of the [Defendants'] wrongdoing"; and (5) an award of "the costs of this actions, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts." (CAC *52.)[8]

---

[8] All page numbers preceded by an asterisk refer to the page numbers atop the ECF header.

As pled, the declaratory relief that Plaintiffs seek would be entered in favor of the individual shareholders, not the Lightstone REIT corporations, because the fiduciary duties that Defendants allegedly breached are those duties owed directly to the shareholders. *See Strougo*, 282 F.3d at 171 (explaining that a direct claim involves an "an injury distinct from an injury to the corporation"). Rescinding and unwinding the 2023 Charter Amendments would also be relief afforded to the stockholders because it would permit the stockholders to vote again on the amendments, presumably after they have received additional disclosures. As to the monetary damages, they are allegedly derived from the change in NAV of the Lightstone REITs between the time the liquidity event would have taken place under the Legacy Charters and their NAV today. (*See* CAC ¶ 72 ("Plaintiffs . . . are therefore left as essentially permanent investors in [the Lightstone REITs]").) Plaintiffs allege that the remedies they seek arise because they have not been able to liquidate their individual shares, not because the overall value of the Lightstone REITs has declined. *Cf. Khoshaba v. Stilwell*, 749 F. Supp. 3d 572, 606 (E.D. Va. 2024) (explaining that under Maryland law, "a decline in stock value does not give rise to a direct claim because both the shareholders and the corporation have suffered the same financial loss"). As such, the Court finds that Plaintiffs seek remedies that are sufficiently distinct from the corporation. The Court, therefore, finds that the claims in Count One are direct.

Because the nature of the wrongs and the remedies sought in Counts Two through Four are sufficiently similar to those in Count One, the Court finds that Counts Two through Four are also direct claims. (*See generally* CAC.) As such, the Court denies Defendants' motion to dismiss on the basis that Plaintiffs' claims are derivative, and they did not make a demand on the boards of the Lightstone REITs.

B.    **Ratification**

"Maryland has long recognized the proposition that a board of directors is not 'liable to the stockholders for acts ratified by them.'" *Wittman v. Crooke*, 707 A.2d 422, 426 (Md. Ct. Spec. App. 1998) (quoting *Coffman v. Md. Publ'g Co.*, 173 A. 248, 254 (Md. 1934)). For an act to be ratified, the transaction must be "disclosed to the shareholders prior to ratification by the majority of disinterested stockholders." *Id.* (citing Md. Code Ann., Corps & Ass'ns § 2-419). The board must disclose "information that is material to the transaction" and "disclose enough information to allow a 'reasonable investor' to make an informed decision regarding the transaction." *S. Miami Pension Plan v. Starwood Waypoint Residential, Tr.*, No. 599, 2022 WL 4707247, at *7 (Md. Ct. Spec. App. Oct. 3, 2022) (citation omitted). The board must also "avoid misleading partial disclosures," and if it decides to speak on a subject, it has "an obligation to provide the stockholders with an accurate, full, and fair characterization." *Id.* at *10 (quotation marks and citation omitted). Even if a transaction includes a potential conflict of interest between a corporation and its board of directors, ratification is possible where "the fact of the . . . interest is disclosed or known to . . . [t]he stockholders entitled to vote." Md. Code Ann., Corps & Ass'ns § 2-419(b).

To determine whether information is material, a court looks to "whether there is 'a substantial likelihood that the disclosure of omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *South Miami Pension Plan*, 2022 WL 4707247, at *7 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). At the motion to dismiss stage, a plaintiff does not adequately plead materiality if "no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Id.* (quoting *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019)) (quotations omitted).

Here, Plaintiffs allege that the Director Defendants and the Lightstone Advisors breached their fiduciary duties to the stockholders by including materially misleading and/or false information in the 2022 Proxy Statements and the 2022 FAQs and by recommending the 2023 Charter Amendments even though they were not in the stockholders' best interests. (*See* CAC ¶¶ 80-96.) Specifically, Plaintiffs allege that the Director Defendants and the Lightstone Advisors' true reasons behind recommending the 2023 Charter Amendments—to avoid liquidation while Lichtenstein's Subordinated Participation Interests were worthless and to rack up additional advisory fees—were concealed from the stockholders. (*See, e.g., id.* ¶¶ 53, 56, 90, 95; Pls.' Opp'n Br. 13.) Defendants argue that Plaintiffs do not adequately plead a breach of fiduciary duty because the stockholders received accurate disclosures in the 2022 Proxy Statements and 2022 FAQs and thereafter ratified the 2023 Charter Amendments. (Defs.' Moving Br. 16.) The Court will analyze the disclosures made for each of the provisions of the 2023 Charter Amendments that Plaintiffs challenge in turn.[9]

### 1.    *The Duration Amendments*

In the stockholder vote for REITs II and III, stockholders voted concerning the duration amendments and whether to: (1) "extend the duration deadline"; (2) "conduct a liquidation event"; or (3) "eliminate that provision of the charter." (CAC ¶ 6.) The 2022 REIT II Proxy, 2022 REIT III Proxy, 2022 REIT II FAQs, and 2022 REIT III FAQs explained that the board:

> [D]etermined that it is in the best interest of the Company and its stockholders to amend the Charter to eliminate the deadline to

---

[9] Plaintiffs incorporated the 2022 Proxy Statements and 2022 FAQs in the CAC, which allows the Court to consider these documents on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (noting that a court may consider a "document integral to or explicitly relied upon in the complaint," without converting a motion to dismiss into a motion for summary judgment); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (explaining that a court may also consider "items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case").

> liquidate and dissolve the Company . . . at this time. Doing so will allow us to engage in transactions that may be beneficial to us and our stockholders and will provide us more flexibility in pursuing various ways to provide liquidity to our stockholders.

(Defs.' Moving Br., Ex. B at *16[10] ("REIT II Proxy"); Defs.' Moving Br., Ex. C at *15 ("REIT III Proxy"); Defs.' Moving Br., Ex. E at *7 ("REIT II FAQ"); Defs.' Moving Br., Ex. F at *6 ("REIT III FAQ").) Plaintiffs argue that this statement means that "the removal of the durational provisions in the REITs' charters was purportedly made to facilitate or hasten liquidity events." (Pls.' Opp'n Br. 12.) But as Defendants point out, that is simply not what this disclosure states was the intention behind the elimination of the duration requirement. (*See* Defs.' Reply Br. 5.) A reasonable stockholder would understand that this recommendation was given to provide additional flexibility in pursuing liquidity, not that liquidity would be pursued more quickly. As such, the Court finds that Plaintiffs fail to plead that the duration amendments were not fully disclosed.

### 2.    *Lichtenstein's Subordinated Partnership Interests*

The crux of Plaintiffs' allegations concern Lichtenstein's Subordinated Partnership Interests. Plaintiffs allege that the real reason behind the 2023 Charter Amendments was to delay liquidation to allow Lichtenstein to monetize his Subordinated Partnership Interests. (*See* CAC ¶¶ 53, 56.) The 2022 Proxy Statements, however, explicitly identify Lichtenstein's Subordinated Partnership Interests in their respective "Related Party Transactions" sections. (Defs.' Moving Br., Ex. A at *25 ("REIT I Proxy") (noting that "Lichtenstein is the indirect, beneficial owner of . . . special general partners interests" that were purchased for $30 million and is entitled to distributions "only after stockholders have received a stated preferred return"); REIT II Proxy at *27-28 (noting that "Lichtenstein is the indirect owner and manager of Lightstone SLP II

---

[10] Page numbers preceded by an asterisk refer to the page number centered in the footer of the exhibits attached to Defendants' moving brief.

LLC, . . . which owns 177.0 subordinated profits interests" that were purchased for $17.7 million and "will only be repaid after stockholders receive a stated preferred return and their net investment"); REIT III Proxy at *26 (noting that "Lichtenstein is the beneficial owner of a 99% interest in . . . [242] Subordinated Participation Interests" that were purchased for $12.1 million and is entitled to a portion of distributions "only after stockholders have received a stated preferred return").)[11] This information disclosed the fact of Lichtenstein's Subordinated Participation Interests in the Lightstone REITs, and as such the information was sufficient to allow the 2023 Charter Amendments to be ratified by the stockholders. *See Wittman*, 707 A.2d at 425 (finding that the shareholders ratified directors' actions where "[t]he proxy statement made full disclosure to the shareholders"); *Hudson v. Prime Retail, Inc.*, No. 24-03-5806, 2004 WL 1982383, at *18 (Md. Cir. Ct. Apr. 1, 2004) (finding that the board fulfilled its disclosure obligations where the allegedly interested director's role was described in the proxy materials on which the complaint relied).

To the extent that Plaintiffs allege that Defendants failed to disclose an improper motive behind the 2023 Charter Amendments, the CAC does not plead any facts to allow the Court to make such an inference. *See Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level."); *In re Johnson & Johnson Talcum Powder Prods. Mtkg., Sales Pracs. & Liability Litig.*, 903 F.3d 278, 281 (3d Cir. 2018) (finding that at the motion to dismiss stage, a "plaintiff must . . . allege facts that would permit a factfinder to determine, without relying on mere conjecture," that a plaintiff's allegations can successfully state

---

[11] While Lichtenstein's Subordinated Participation Interests were not consistently referred to by that name (they were also referred to as special general partner interest and subordinated profits interests), they were consistently defined with the same or a substantially similar description. (*See* REIT I Proxy at *25; REIT II Proxy at *27-28; REIT III Proxy at *26.)

a claim). As such, the Court finds that Plaintiffs fail to plead that Lichtenstein's Subordinated Participation Interests were not fully disclosed.

### 3.   *Fiduciary Duties*

Plaintiffs allege that the 2023 Charter Amendments "[e]liminat[ed] fiduciary duties that the boards owe[d] to the Lightstone REITs and shareholders, and the directors' fiduciary duties to supervise the relationships of the Lightstone REITs and their external advisors, the [Lightstone Advisors]" and that this proposed amendment was not fully or accurately disclosed to the shareholders. (CAC ¶ 4(a).) The 2022 Proxy Amendments, however, explicitly disclosed this proposed amendment. They explain that new charters would "no longer provide that directors are fiduciaries of the Company and our stockholders," but rather that the:

> [D]irectors would be held to the standard of conduct imposed under Maryland law, which requires a director to perform his duties in good faith, in a manner he reasonably believes to be in our best interests and with the care that an ordinarily prudent person in a like position would use under similar circumstances. We are recommending this revision because we believe it will improve our ability to retain and recruit board candidates.

(REIT I Proxy at *13; REIT II Proxy at *16; REIT III Proxy at *15.) As such, the Court finds that Plaintiffs fail to plead that the fiduciary duty amendments were not fully disclosed.

### 4.   *Roll-Up Transactions*

Plaintiffs allege that the 2023 Charter Amendments "eliminat[ed] certain protections in the event of a roll-up transaction, including appraisal rights for shareholders, and the ability to retain securities in their previous entity or receive cash in lieu of securities in another entity," and that this proposed amendment was not fully or accurately disclosed to the shareholders. (CAC ¶ 4(b).) The 2022 Proxy Amendments, however, explicitly disclosed this proposed amendment. They explain that the Legacy Charters provided for certain protections in the event of a roll-up transaction, including "an appraisal of the Company's assets as of a date immediately prior to the

announcement of the proposed roll-up transaction" and that stockholders who vote against a roll-up transaction must be given the choice to "accept[] the securities of the roll-up entity" or either remain stockholders of the Company or receive cash equal to their proportionate share of the company. (REIT I Proxy at *11; REIT II Proxy at *13; REIT III Proxy at *12.) They further explain that if the amendment related to roll-up transactions is approved:

> [S]tockholders will no longer receive the benefit of these protections. However, stockholder approval will continue to be required for us to effect a roll-up transaction. We recommend this change to increase our flexibility to enter into a roll-up transaction that our board of directors and our stockholders may believe to be in our best interest.

(REIT I Proxy at *11; REIT II Proxy at *13; REIT III Proxy at *12.) As such, the Court finds that Plaintiffs fail to plead that the roll-up transaction amendments were not fully disclosed.

### 5. *Quorum Requirement*

Plaintiffs allege that the 2023 Charter Amendments "eliminat[ed] quorum requirements of at least 50% of all votes entitled to be cast at a stockholder meeting, and permitt[ed] [a] reduction of the votes required for quorum," and that this proposed amendment was not fully or accurately disclosed to the shareholders. (CAC ¶ 4(c).) The 2022 Proxy Amendments, however, explicitly disclosed this proposed amendment. They state that the Company may lower the quorum requirement from 50% and that:

> We believe this change is in the best interest of the Company; however, by removing the quorum requirement from our charter and including it in our bylaws, our Board of Directors will have the exclusive power to change our quorum requirement. This will permit our Board of Directors to decrease our quorum requirement in order to counter someone who solicits proxies and then withholds them to try to defeat a quorum and prevent the transaction of company business.

(REIT I Proxy at *12; REIT II Proxy at *15; REIT III Proxy at *14.) As such, the Court finds that Plaintiffs fail to plead that the quorum requirement amendments were not fully disclosed.

21

### 6.    *Stockholder List Amendment*

Plaintiffs allege that the 2023 Charter Amendments "replac[ed] provisions permitting any shareholder to receive a shareholder list for non-commercial purposes with a requirement that, to receive a copy of the shareholder list, a shareholder must have owned at least 5% of the outstanding stock of any class of shares for six months or more," and that this proposed amendment was not fully or accurately disclosed to the shareholders. (CAC ¶ 4(d).) The 2022 Proxy Amendments, however, explicitly disclosed this proposed amendment. They explain that "the rights of our stockholders to obtain a list of stockholders, will be limited to the rights provided for under Maryland law. These rights are more restrictive than those included in our current charter." (REIT I Proxy at *13; REIT II Proxy at *15; REIT III Proxy at *14.) They further explain:

> Our board of directors believes that these revisions increase the Company's ability to protect the privacy of its stockholders and reduce the Company's exposure to potentially exploitive mini-tender offers for shares of our stock by increasing the threshold at which stockholders may access information related to our stockholders. We believe the changes also enhance our anti-takeover defenses by making it more difficult for a potential acquirer to acquire shares or to contact stockholders for the purpose of trying to influence our management. Although we believe the changes are in the best interest of the Company, the proposed charter changes may discourage others from trying to acquire control of us, which may reduce your ability to liquidate your investment in us or to receive a control premium for your shares. The proposed changes may also make it more difficult for our stockholders to communicate with each other to influence our management, which could result in policies, actions or board composition that are not as favorable to you as they otherwise would be.

(REIT I Proxy at *13; REIT II Proxy at *15; REIT III Proxy at *14.) As such, the Court finds that Plaintiffs fail to plead that the stockholder list amendments were not fully disclosed.

### 7.    *Exculpation Amendment*

Plaintiffs allege that the 2023 Charter Amendments "expand[] each REIT's ability to exculpate and indemnify officers and directors, and advance defense expenses in the case of

litigation, to the maximum extent permitted by Maryland law," and that this proposed amendment was not fully or accurately disclosed to the shareholders. (CAC ¶ 4(e).) The 2022 Proxy Amendments, however, explicitly disclosed this proposed amendment:

> In order to conform our charter more closely with those of our competitor REITs who are listed on an exchange, and to retain and recruit qualified and experienced officers and directors, we are proposing to remove . . . limitations [on the board's ability to indemnify and exculpate consistent with those in the NASAA REIT Guidelines] and instead provide that we shall exculpate and indemnify our officers and directors to the maximum extent permitted by Maryland law.

(REIT I Proxy at *12; REIT II Proxy at *14; REIT III Proxy at *13.) As such, the Court finds that Plaintiffs fail to plead that the exculpation amendments were not fully disclosed.

Having found that each of the 2023 Charter Amendments was fully disclosed in the 2022 Proxy Materials and the 2022 FAQs, the Court concludes that these amendments were in fact ratified by a majority of disinterested shareholders.[12] *See Wittman*, 707 A.2d at 425-26 (dismissing claims where the court found that everything that plaintiff complained about was "ratified by a stockholder vote that occurred after a full and fair disclosure to the stockholders"). Plaintiffs, therefore, have not adequately pled a claim for breach of fiduciary duties against the Director Defendants or the Lightstone Advisors, and the Court dismisses Counts One through Three.

## C.    Breach of Contract

Plaintiffs allege that Defendants breached the Legacy Charters by breaching their fiduciary duty to the stockholders, as laid out in the Legacy Charters, and by violating the implied duty of good faith and fair dealing. (CAC ¶¶ 105-11.) The Court has already found that Plaintiffs have not adequately pled a breach of fiduciary duty claim, and so Plaintiffs' breach of contract claim cannot move forward on that basis. The Court, therefore, only considers whether Plaintiffs have

_____

[12] Plaintiffs do not dispute that the vote was conducted by a majority of disinterested shareholders.

adequately pled a violation of the implied duty of good faith and fair dealing as to the Legacy Charters.

"Under Maryland law, a duty of good faith and fair dealing is an implied term in certain contracts, but this duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992) (citations omitted). Put differently, "under the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *Clancy v. King*, 954 A.2d 1092, 1109 (Md. 2008) (quoting *E. Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 184 (4th Cir. 2000)).

Here, Plaintiffs allege that Defendants breached the covenant of good faith and fair dealing "[b]y intentionally depriving Plaintiffs and the Class of the benefit of their bargain as set forth in the Legacy Charters." (CAC ¶ 110.) Without further factual allegations, however, the Court cannot draw a reasonable inference as to how Plaintiffs were denied their benefit of the bargain. *Twombly*, 550 U.S. at 545. As such, the Court also dismisses Count Four against Defendants.

IV.    **CONCLUSION**

For the reasons set forth herein, Defendants' Motion to Dismiss is granted, and the CAC is dismissed without prejudice. The Court will issue an Order consistent with this Memorandum Opinion.

Dated: August 31, 2025

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

24