**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KENNETH N. AYER, *et al.*,<br>Plaintiffs,<br>v.<br>LIGHTSTONE VALUE PLUS REIT I, INC., *et al.*,<br>Defendants. | Civil Action No. 24-10371 (MAS) (TJB)<br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Lightstone Value Plus REIT I, Inc., Lightstone Value Plus REIT LLC, Lightstone Value Plus REIT II, Inc., Lightstone Value Plus REIT II LLC, Lightstone Value Plus REIT III LLC, Yehuda I. Angster ("Angster"), Howard E. Friedman ("Friedman"), David Lichtenstein ("Lichtenstein"), Alan Retkinski ("Retkinski"), and George R. Whittemore's ("Whittemore" and collectively with Angster, Friedman, Lichtenstein, Retkinski, the "Director Defendants" and collectively with Lightstone Value Plus REIT I, Inc., Lightstone Value Plus REIT LLC, Lightstone Value Plus REIT II, Inc., Lightstone Value Plus REIT II LLC, Lightstone Value Plus REIT III LLC, "Defendants") Motion to Dismiss (ECF No. 20) Plaintiffs Kenneth N. Ayer, Martha Harvey, and Larry Melton's (collectively, "Plaintiffs") First Amended Class Action Complaint ("FAC") (ECF No. 14). Plaintiffs opposed (ECF No. 21), and Defendants replied (ECF No. 22). After careful consideration of the parties' submissions, the Court decides Defendants' motion without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons outlined below, Defendants' Motion to Dismiss is denied.

## I. BACKGROUND[1]

The parties are familiar with the factual and procedural history of this matter, and, therefore, the Court includes only those facts necessary to resolve the instant motion. On August 31, 2025, the Court granted Defendants' first Motion to Dismiss. (Aug. 2025 Op., ECF No. 12.) The Court identified several deficiencies in Plaintiffs' Class Action Complaint and granted Plaintiffs leave to file an amended class action complaint to cure those deficiencies, which Plaintiffs did in October 2025. (*Id.*; FAC, ECF No. 14.)

### A. Parties

Plaintiffs bring this putative class action on behalf of investors who own illiquid shares of common stock of Lightstone Value Plus REIT I ("REIT I"), Lightstone Value Plus REIT II ("REIT II"), and Lightstone Value Plus REIT III ("REIT III") (collectively, the "Lightstone REITs"). (*See generally* FAC.) At all relevant times, Plaintiffs held common shares in either REIT I, REIT II, or REIT III. (*Id.* ¶ 18.) The Lightstone REITs are all incorporated in Maryland and have their principal place of business in New Jersey. (*Id.* ¶¶ 19, 21-22.)

Lightstone Value Plus REIT LLC serves as the external advisor to REIT I, and Lightstone Value Plus REIT II LLC serves as the external advisor to REIT II. (*Id.* ¶¶ 20-21.) The Court refers to those entities collectively as the "Lightstone Advisors" or "Advisor Defendants." Lichtenstein has served as the Chairman and Chief Executive Officer of REITs I, II, and III since 2004, 2008, and 2012, respectively, and owns the Lightstone Advisors. (*Id.* ¶ 25.) Angster, Whittemore, Friedman, and Retkinski served as directors of either REIT I, REIT II, or REIT III at all relevant times. (*Id.* ¶¶ 23-24, 26-27.)

---

[1] For the purpose of considering the instant motion, the Court accepts all factual allegations in the FAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

### B. Non-Traded REITs

The Lightstone Group sponsored and sold five publicly registered, non-traded REITs marketed to "mom and pop" retail investors. (*Id.* ¶ 29.) The non-traded Lightstone REITs are illiquid investments because their shares are not traded on national securities exchanges. (*Id.* ¶ 30.) Many non-traded REITs suffer from pricing inefficiencies because their net asset values are calculated by the investment sponsors, and the shares may be worth substantially less once they become freely tradable on a public stock exchange. (*Id.*)

Non-traded REITs also are subject to periodic filing requirements with the Securities and Exchange Commission ("SEC"). (*Id.* ¶ 31.) Because these investments are not traded publicly, stockholders generally have limited options for liquidating their positions. (*Id.* ¶ 32.) To liquidate, REIT's stockholders may either: (1) "redeem a portion of their shares directly with the sponsor" which typically occurs "only during a certain time frame and only in a certain amount as agreed to by the sponsor[;]" or (2) "tender their shares to a third-party investor . . . willing to purchase their shares, but often at a disadvantageous price." (*Id.*) As a result, investors of non-traded REITs often must wait for a liquidity event to maximize returns or mitigate losses. (*Id.* ¶ 34.) Although liquidity events for non-traded REITs typically occur five to seven years after the time of the initial investment, none of the Lightstone REITs here have held a liquidity event. (*Id.* ¶¶ 34-35.)

### C. The Legacy Charters

Each Lightstone REIT's original charter (the "Legacy Charter") contained provisions governing its duration and liquidation obligations. (*Id.* ¶ 47.) Under the Legacy Charters, by a specific deadline, each REIT either was required to: (1) seek shareholder approval of an amendment extending the REIT's duration; or (2) adopt a plan of liquidation. (*Id.* ¶ 36.) Those

deadlines were October 10, 2018, for REIT I, September 20, 2024, for REIT II, and March 31, 2025, for REIT III. (*Id.*) REIT I's shareholders approved an extension of its deadline in 2017. (*Id.*)

### D. Lichtenstein's Subordinated Participation Interests

Lichtenstein, through the Lightstone Group, LLC and three special purpose entities, indirectly holds equity investments in the Lightstone REITs, referred to as "SPIs." (*Id.* ¶ 42.) Plaintiffs allege that the SPIs are potentially worth $59.8 million or more, but receive distributions only after stockholders are paid their stated preferred returns. (*Id.* ¶¶ 42, 45.) Plaintiffs further allege that if REIT II and REIT III had liquidated during the 2024-2025 timeframe or earlier, as required by their Legacy Charters, Lichtenstein's SPIs would have been worthless. (*Id.* ¶ 43.)

### E. 2023 Charter Amendments

In late 2022, REITs II and III announced they were seeking shareholder approval to amend their Legacy Charters (the "2023 Charter Amendments" or "Amendments"). (*Id.* ¶ 56.) The Amendments eliminated Article XV of the Legacy Charters, which described the timeframe required either to hold a liquidation event or extend the deadline to have a liquidation event. (*Id.* ¶¶ 52, 54, 56.) Other amendments included: (1) eliminating the fiduciary duties that the boards owe to the Lightstone REITs' stockholders; (2) eliminating certain protections in the event of a roll-up transaction; (3) reducing the quorum requirements to 33% of votes entitled to be cast; (4) replacing provisions permitting any shareholder to receive a shareholder list and requiring that a shareholder own 5% of outstanding stock for six months before receiving a list of shareholders; and (5) expanding each Lightstone REIT's ability to exculpate and indemnify officers and directors "to the maximum extent permitted by Maryland law." (*Id.* ¶ 57.)

**F. The Allegedly False and Misleading Proxy Statements**

Plaintiffs allege that, in connection with the 2023 Charter Amendments, Defendants filed with the SEC "materially incomplete and misleading" proxy statements and misleading frequently asked questions documents. (*Id.* ¶ 58.) Specifically, the proxy statements filed for REIT I, REIT II, and REIT III on October 18, 2022, and the supplemental frequently asked questions filed for those REITs in November 2022 contained materially incomplete and misleading information. (*Id.* ¶¶ 59-61.) The Court refers to those materials collectively as the "2022 Proxy Statements" and the "2022 FAQs."

Plaintiffs allege that the 2022 Proxy Statements and 2022 FAQs failed to disclose that Lichtenstein's SPIs created a conflict of interest in connection with the 2023 Charter Amendments. (*Id.* ¶¶ 64, 67-68.) According to Plaintiffs, if REIT II and REIT III had liquidated within the timeframe required by the Legacy Charters or earlier, Lichtenstein's SPIs would have received no liquidating distribution. (*Id.* ¶¶ 64, 68, 71.) Plaintiffs therefore allege that Lichtenstein had a financial incentive to eliminate the liquidation deadline and continue operating the Lightstone REITs until those interests could be monetized. (*Id.* ¶¶ 68, 71.)

Plaintiffs claim that the 2022 Proxy Statements were misleading because they represented that "all related party transactions involving more than $120,000" required the Board of Directors (the "Board") approval and that the Board generally would approve only those transactions that did not create a conflict of interest. (*Id.* ¶ 72.) According to Plaintiffs, those disclosures suggested to a reasonable shareholder that Lichtenstein's SPIs did not pose a conflict of interest. (*Id.* ¶ 73.) Plaintiffs, however, allege that the SPIs created a conflict of interest because Lichtenstein had a financial incentive to delay liquidations, leaving common shareholders with "interminably illiquid assets." (*Id.* ¶ 74.) Although the 2022 Proxy Statements disclosed that Lichtenstein's SPIs may

entitle Lichtenstein to a portion of any liquidating distribution, Plaintiffs allege that the disclosures failed to state that Lichtenstein's SPIs "would not have received *any* liquidating distributions had the liquidations proceeded in the [required] time frame." (*Id.* ¶ 79 (emphasis in original).)

### G. Post-2023 Charter Amendments

REIT II and REIT III did not receive sufficient votes to approve the 2023 Charter Amendments at their December 8, 2022, annual shareholders' meeting. (*Id.* ¶¶ 84-85.) The Amendments later were passed when the stockholders reconvened on January 17, 2023. (*Id.*) Plaintiffs allege that, between those meetings, solicitors engaged by Lightstone called the shareholders and stated that the Board recommended a "yes" vote because it was "the most likely path to liquidity." (*Id.* ¶ 86.) According to Plaintiffs, the script used by the solicitors, which was given to them by Defendants, was materially misleading because a "yes" vote "served to delay indefinitely a liquidity event, and thus was the opposite of the most likely path to liquidity." (*Id.*) Plaintiffs also allege that REIT II implemented the Amendments despite failing to receive the requisite 50% shareholder vote. (*Id.* ¶ 88.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure[2] 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675

---

[2] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

(2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III. <u>DISCUSSION</u>

Defendants move to dismiss the FAC because: (1) Maryland law exculpates directors for the corporate acts ratified by stockholder vote; (2) the proxy statements fully and accurately disclosed the charter amendments; (3) the business judgment rule protects the Directors' decision making; (4) the FAC fails to state a breach of contract claim; and (5) a majority of REIT II's outstanding shares voted for the 2023 Charter Amendments. (Defs.' Moving Br. 11-29, ECF No., 20-1.)

### A. Ratification[3]

"Maryland has long recognized the proposition that a board of directors is not 'liable to the stockholders for acts ratified by them.'" *Wittman v. Crooke*, 707 A.2d 422, 426 (Md. Ct. Spec. App. 1998) (quoting *Coffman v. Md. Publ'g Co.*, 173 A. 248, 254 (Md. 1934)). For an act to be ratified, the transaction must be "disclosed to the shareholders prior to ratification by the majority of disinterested stockholders." *Id.* (citing Md. Code Ann., Corps. & Ass'ns § 2-419). The board must disclose "information that is material to the transaction" and "disclose enough information to allow a 'reasonable investor' to make an informed decision regarding the transaction." *S. Miami Pension Plan v. Starwood Waypoint Residential, Tr.*, No. 599, 2022 WL 4707247, at *7 (Md. Ct. Spec. App. Oct. 3, 2022) (citation omitted). The board must also "avoid misleading partial disclosures," and if it decides to speak on a subject, it has "an obligation to provide the stockholders with an accurate, full, and fair characterization." *Id.* at *10 (internal quotation marks and citation omitted). Even if a transaction includes a potential conflict of interest between a corporation and its board of directors, ratification is possible where "the fact of the . . . interest is disclosed or known to . . . [t]he stockholders entitled to vote[.]" Md. Code Ann., Corps. & Ass'ns § 2-419(b).

To determine whether information is material, a court looks to "whether there is 'a substantial likelihood that the disclosure of omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *S. Miami Pension Plan*, 2022 WL 4707247, at *7 (alteration in original) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). At the motion to dismiss stage, a plaintiff does not

[3] The Court acknowledges that the parties dispute whether the percentage of "yes" votes ratifying REIT II's Amendments exceeded the required 50% threshold. (FAC ¶¶ 13, 88; Defs.' Moving Br. 29.) The Court, however, need not resolve that dispute at this stage because the precise voting percentage is immaterial to the Court's analysis and does not alter its findings.

adequately plead materiality if "no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Id.* (quoting *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019)).

### *1. The Duration Amendments*

REIT II's Legacy Charter contained a provision that required: (1) an extension to eliminate its liquidity deadline; (2) elimination of the duration provision in the charter; or (3) a liquidation event to occur by September 20, 2024. (FAC ¶¶ 52-53.) REIT III's Legacy Charter imposed the same requirement by March 31, 2025. (*Id.* ¶¶ 54-55.) The 2022 REIT II and Reit III Proxy materials stated that the board:

> [D]etermined that it is in the best interest of the Company and its stockholders to amend the Charter to eliminate the deadline to liquidate and dissolve the Company . . . at this time. Doing so will allow us to engage in transactions that may be beneficial to us and our stockholders and will provide us more flexibility in pursuing various ways to provide liquidity to our stockholders.

(Ex. B to Bosse Decl. ("REIT II Proxy") 16, ECF. No. 20-2; Ex. C to Bosse Decl. ("REIT III Proxy") 15; Ex. E to Bosse Decl. ("REIT II FAQ") 7; Ex. F to Bosse Decl. ("REIT III FAQ") 6).)

The FAC alleges new facts that the duration-amendment disclosures were materially misleading for two reasons. *First*, after REIT II and REIT III failed to obtain sufficient votes at the December 2022 meeting, Lightstone solicitors told stockholders that a "'yes' vote was the most likely path to liquidity." (FAC ¶¶ 86, 112-13.) According to Plaintiffs, that statement was misleading because it was "inconsistent with the [Lightstone] REITs' later admissions that they did not intend to list the [Lightstone] REITs' shares for public trading." (*Id.* ¶¶ 86, 112-113.) *Second*, Lichtenstein's and other Lightstone REITs' past course of dealing demonstrates that the representations about extending the REITs' duration to provide "more flexibility in pursuing various ways to provide liquidity to [the] stockholders," actually meant that much of the new

capital would be placed in "new projects of extended duration being developed by Lichtenstein's other companies," which further "suggests that Lichtenstein neither had nor has [a] desire to liquidate REIT I or any of the Lightstone REITs unless and until it is profitable to him[]." (*Id.* ¶¶ 10, 94.) Defendants, however, argue that Plaintiffs misunderstand the Lightstone REITs' proxy statements because "flexibility" in pursuing liquidity does not mean that liquidity would be pursued quicker. (Defs.' Moving Br. 16 (citing Aug. 2025 Op.).) Defendants also argue that the shareholder calls were not improper because, like the SEC-filed proxy statements, they were made to solicit stockholder votes. (*Id.* at 14 n.8 (citation omitted).)

The Court finds that Plaintiffs adequately alleged that statements made during the phone calls were misleading half-truths. *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024) ("Half-truths . . . are 'representations that state the truth only so far as it goes, while omitting critical qualifying information.'" (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)). Plaintiffs allege that the "'yes' vote served to delay indefinitely a liquidity event" and "was the opposite of the most likely path to liquidity" and that Defendants' solicitors failed to disclose those facts. (FAC ¶ 86.) Although stockholders receiving the solicitors' calls had access to the 2023 Proxy Statements, "once defendants traveled down the road of partial disclosure . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization" of the disclosures. *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994); *see also S. Miami Pension Plan*, 2022 WL 4707247, at *10 ("Directors must [] avoid misleading partial disclosures.'" (alteration in original) (quoting *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 22 (Del. Ch. 2014))).[4] Because Plaintiffs allege

[4] Courts in Maryland have found Delaware law instructive on evaluating uninformed votes in regard to proxy statements. *See Oliveira v. Sugarman*, 152 A.3d 728, 746 (Md. 2017).

that the solicitors' calls failed to disclose that the amendments eliminated the liquidation deadline, Plaintiffs have adequately alleged that the ratification of the duration amendments was based on a misleading half-truth. *See S. Miami Pension Plan*, 2022 WL 4707247, at *7.

### 2. *Lichtenstein's SPIs*

Plaintiffs allege that the real purpose of the 2023 Charter Amendments was not to "facilitate the Lightstone REITs' pursuit of liquidity by providing flexibility as to the time of liquidation," but rather to delay liquidation and "continue to operate the Lightstone REITs indefinitely until Defendant Lichtenstein's [SPIs] could be monetized." (FAC ¶ 4.) Plaintiffs allege that the proxy disclosures failed to inform shareholders that the "[SPIs] placed Lichtenstein's financial interests in direct conflict with those of Lightstone REITs' common shareholders[.]" (*Id.* ¶ 6.) Specifically, that "Lichtenstein would have received no distributions upon liquidation had REIT II and REIT III liquidated in the 2024-25[-]time frame as required under the Legacy Charters . . . whereas common shareholders would have received substantial cash distributions." (*Id.*)

Defendants argue in support of dismissal that the 2023 Proxy Statements disclosed the relevant information because they "informed stockholders that the [SPIs] could be repaid only *after* the stockholders received their stated preferred return on their net investment." (Defs.' Moving Br. 17 (emphasis in original).) Defendants also point to the 2023 Proxy Statements' disclosure that, "through his ownership and control of The Lightstone Group, LLC, [] Lichtenstein is the indirect owner and manager of Lightstone SLP II LLC, . . . which owns 177.0 subordinated profits interests . . . in the Operating Partnership which were acquired for aggregate consideration of $17.7 million." (*Id.* at 17 n.10 (alterations in original) (citation omitted).)

Plaintiffs' allegations are not that the existence of the SPIs was undisclosed. (*See generally* FAC.) Rather, Plaintiffs contend that the conflict of interest created by those interests was inadequately disclosed. (*See generally* FAC.) According to Plaintiffs, to understand that Lichtenstein's SPIs would not receive any liquidating distribution if liquidation occurred in the previously required timeframe, an investor would have had to "calculate the cumulative preferred return . . . based on historical SEC filings." (*Id.* ¶ 79.) Only after performing those calculations could an investor have discovered that "common stock had not received the cumulative stated preferred return of 7% in the case of REIT II, and 6% in the case of REIT III," which are below the "stated cumulative, pre-tax non-compound return over and above the initial offering price of $10.00 a share[,]" rendering Lichtenstein's SPIs worthless. (*Id.* ¶¶ 43, 79.)

The Court agrees that "[p]roxies should be lucid, and not a game of Clue." *Laidlaw v. GigAcquisitions2, LLC*, No. 21-821, 2023 WL 2292488, at *11 (Del. Ch. Mar. 1, 2023). Shareholders are entitled to clear disclosure of material information. *S. Miami Pension Plan*, 2022 WL 4707247, at *7 (noting that a "[b]oard must disclose information that is material to the transaction" and "must disclose enough information to allow a 'reasonable investor' to make an informed decision regarding the transaction"). Shareholders are not required to reconstruct those conflicts by combing through historical SEC filings and performing their own financial calculations. *See Shaev v. Saper*, 320 F.3d 373, 381 (3d Cir. 2003) ("[A]n investor could hypothetically conduct research to clarify ambiguities and discover omissions in the proxy statement [but that] does not relieve the [b]oard of its obligations . . . .").

Here, Plaintiffs have plausibly alleged that the proxy statements failed to disclose that Lichtenstein's SPIs would receive no distribution if REIT II and REIT III liquidated in the required timeframe, while common shareholders would receive substantial cash distributions. (FAC ¶ 6.)

That alleged omission goes directly to whether Lichtenstein had a financial incentive to delay liquidation and continue operating the Lightstone REITs until his interests could be monetized. (*Id.* ¶ 2.) This omission is significant because materiality turns on whether there is "a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc.*, 426 U.S. at 449; *see also S. Miami Pension Plan*, 2022 WL 4707247, at *7.

The Court finds that Plaintiffs have adequately alleged that this omission is material. As such, the Court will not charge shareholders with knowledge of information that was not fairly disclosed in the proxy statements. *See Shaev*, 320 F.3d at 381 ("Material not included in the proxy statement is generally not charged to the knowledge of the stockholder." (citation omitted)). The Court also finds it plausible that a reasonable stockholder "might take [this conflict of interest] into account in deciding whether to vote to authorize the [2023 Charter Amendments]." *Id.* at 382; *see TSC Indus., Inc.*, 426 U.S. at 449 ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.").

At this stage, accordingly, Plaintiffs have adequately alleged that the proxy statements were materially misleading and that the shareholder votes approving the 2023 Charter Amendments were not fully informed.

### 3. *The Remaining Amendments*

Plaintiffs have failed to plead additional facts regarding the fiduciary duty, roll-up transaction, quorum requirement, stockholder list amendment, and exculpation amendments. (*See generally* FAC.) For substantially the same reasons previously discussed in the August 2025 Opinion, the Court finds that the 2022 Proxy Amendments, as listed, explicitly disclosed the proposed amendment. (*See generally* Aug. 2025 Op.)

The Court finds, however, that the material omissions and half-truths involving the duration amendments and the SPIs do not exculpate directors for corporate acts ratified by stockholder vote. *Special Situations Fund III QP, L.P. v. Travel Ctrs. of Am. Inc.*, 347 A.3d 493, 522 (Md. App. Ct. 2025) (recognizing that stockholder ratification only extinguishes claims "once the stockholders are informed fully about the material facts concerning a proposed transaction"); *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (recognizing that only a "fully informed shareholder ratification will insulate a board action from subsequent legal attack by shareholders"). As such, the Court now turns to Count One.

**B. Count One — Director Defendants' Breach of Fiduciary Duties**

Defendants argue that Plaintiffs "have no claim that [the D]irectors . . . breached a fiduciary duty when [the] proxy statements informed them about a proposed change to a charter and a majority of the stockholders voted for that change." (Defs.' Moving Br. 12.) Plaintiffs, however, allege that Director Defendants breached their fiduciary duties by: (1) "act[ing] disloyally and in bad faith by, *inter alia*, recommending the 2023 Charter Amendments that were not in the shareholders best interest[;]" (2) "disseminating the 2022 Proxy Statements and the 2022 FAQs that were false, misleading[,] and/or incomplete[;]" (3) "unfairly depriv[ing] Plaintiffs and the Class of their ability to make intelligent and informed decisions about whether to vote in favor of the 2023 Charter Amendments[;]" and (4) "deceiv[ing] Plaintiffs and the Class." (FAC ¶¶ 123, 125.)

Plaintiffs further allege that Director Defendants Angster and Whittemore were "longtime Lichtenstein associates who were on the board of REIT I when the 2017 REIT I Proxy was disseminated[.]" (*Id.* ¶ 127.) According to Plaintiffs, Angster and Whittemore therefore were aware of Lichtenstein's alleged motives and could not "have believed in good faith that

Lichtenstein had a genuine desire to liquidate REITs II and III . . . unless [doing so] would profit Lichtenstein and his companies." (*Id.*) Plaintiffs rely on the Director Defendants' board fees to support this contention. (*Id.* ¶¶ 129-130.) Specifically, Plaintiffs allege that Angster, who served alongside Lichtenstein on the Board of REIT I, REIT II, and REIT III, "has collected approximately $630,000 in board fees," while Whittemore, who also served on all three Lightstone REITs' boards, "collected approximately $1,850,000 in board fees." (*Id.*)

### *1. The Business Judgment Rule*

Defendants argue that, even if stockholder ratification does not foreclose Plaintiffs' claims, those claims are independently barred by the business judgment rule, which protects the Directors Defendants' decision making. Under Maryland law, a claim for breach of a fiduciary duty requires: (1) "the existence of a fiduciary relationship;" (2) "breach of the duty owed by the fiduciary to the beneficiary;" and (3) "harm to the beneficiary." *Plank v. Cherneski*, 231 A.3d 436, 466 (Md. 2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). "Maryland courts have clearly established the proposition that directors and officers owe fiduciary duties to both the corporation *and* the shareholders." *Strougo v. Bassini*, 282 F.3d 162, 173 (2d Cir. 2002) (emphasis in original). The Maryland Legislature further has clarified that Section 2-405.1 of the Maryland Code, Corporations and Associations, is "the sole source of duties of a director to the corporation or [to] the stockholders of the corporation." Md. Code Ann., Corps. & Ass'ns § 2-405.1(i)(1). These duties require directors to act: "(1) [i]n good faith; (2) [i]n a manner the director reasonably believes to be in the best interests of the corporation; and (3) [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." *Id.* § 2-405.1(c). Maryland courts apply this statutory standard through the business judgment rule, which presumes

that directors acted properly in making business decisions. *Cherington Condo. v. Kenney*, 272 A.3d 852, 862-63 (Md. Ct. Spec. App. 2022); Md. Code Ann., Corps. & Ass'ns § 2-405.1(g).

"There are two ways in which a [plaintiff] may overcome the presumptions of the business judgment rule." *Cherington Condo.*, 279 A.3d at 863. First, a plaintiff may make a showing of "fraud or bad faith." *Id.* (citing *Reiner v. Ehrlich*, 66 A.3d 1132, 1140 (Md. Ct. Spec. App. 2013)). If a plaintiff meets this burden, the business judgment rule does not apply. *Id.* Second, a plaintiff may show "that a director has a conflict of interest relating to the board's decision [such] that the director, or someone close to that director, has a personal financial interest in the outcome of the board's decision." *Id.* (citing *Francis v. Brigham-Hopkins Co.*, 70 A. 95, 101 (Md. 1908)). "If a party makes this initial showing of a conflict of interest, then the burden shifts to the board to 'show that it was just and proper, and that no advantage was taken of the stockholders.'" *Id.* (citation omitted).

### 2. *Bad Faith or Fraud*

Plaintiffs' allegations plausibly support an inference that the challenged business decision was undertaken in bad faith. As discussed above, Plaintiffs have sufficiently alleged that the shareholder vote was not a fully informed vote because Defendants failed to disclose the conflict created by Lichtenstein's SPIs. In *Special Situations*, the Appellate Court of Maryland rejected a bad-faith exception where the board disclosed "all material information to the stockholders," including Directors' conflicts of interest, the parties' relationships, the company's value, and the business reasons for the challenged decision. 347 A.3d at 516. That court emphasized that the plaintiffs' attempt to overcome the presumption of the business judgment rule failed because "missing from these allegations is what more the Directors should have disclosed and why what was not disclosed was material." *Id.*

Here, Plaintiffs allege what was missing in the plaintiff's complaint in *Special Situations*. Although the Proxy Statements disclosed that Lichtenstein's SPIs could entitle the Directors to a portion of a liquidating distribution, Plaintiffs allege that Defendants failed to disclose that those interests created a conflict because they would have been worthless if the Lightstone REITs liquidated under the Legacy Charters' original timeline. (FAC ¶¶ 3, 43, 64, 67, 71, 78.) Plaintiffs further allege that the omission was material because shareholders were asked to approve the 2023 Charter Amendments that removed the liquidation deadlines. (*Id.* ¶¶ 1-2.) Some shareholders were also told that voting for the 2023 Charter Amendments was the most likely path to liquidity. (*Id.* ¶ 86.) Plaintiffs allege that this representation was misleading because the Amendments removed the liquidation deadlines and allowed Lichtenstein to preserve his personal financial interest at the expense of shareholder liquidity. (*Id.* ¶¶ 8, 74, 104.) Taking these allegations as true, as the Court must at this stage, the allegations plausibly support an inference that the Director Defendants acted in bad faith by recommending the Amendments, while failing to fully disclose the alleged conflict and the effect of the vote on shareholders' ability to obtain liquidity.

### *3. Conflict of Interest*

The FAC also plausibly alleges a conflict of interest sufficient to overcome the presumption of the business judgment rule. Plaintiffs allege that the Director Defendants were not merely exercising business judgment when they approved and recommended the 2023 Charter Amendments. Plaintiffs allege, rather, that the Director Defendants approved and recommended the Amendments to delay liquidation and preserve Lichtenstein's ability to monetize his SPIs. (*Id.* ¶¶ 1-2, 4, 71.) Director Defendants maintain that, since "the majority of the Directors of each Board were independent," there could not have been a conflict of interest. (Defs.' Moving Br. 26.) Plaintiffs' allegations, however, plausibly support an inference that the challenged conduct was

undertaken to advance a personal financial interest in the outcome, rather than the interests of the shareholders generally. *See Boland v. Boland*, 31 A.3d 529, 549 (Md. 2011) ("[D]irectors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." (quoting *Werbowsky v. Collomb*, 766 A.2d 123, 138 (Md. 2001))).

At this stage, accordingly, Plaintiffs have pled facts sufficient to overcome the presumption of the business judgement rule. The Court therefore denies Defendant's Motion to Dismiss Count One of the FAC.

**C. Count Two — Advisor Defendants' Breach of Fiduciary Duties**

Consistent with their argument concerning the Director Defendants and stockholder ratification, Defendants contend that Plaintiffs "have no claim that [the] . . . advisors breached a fiduciary duty when [the] proxy statements informed them about a proposed change to a charter and a majority of the stockholders voted for that change." (Defs.' Moving Br. 12.) Plaintiffs, however, allege that the Advisor Defendants "stood on both sides of the transaction with respect to the adoption of the 2023 Charter Amendments," because they are owned and controlled by Lichtenstein, who stood to benefit from the Amendments. (FAC ¶ 134.) Specifically, Plaintiffs allege that Lichtenstein's wholly owned advisory entities received more than $9.8 million from the Lightstone REITs in 2022. (*Id.* ¶ 38.) Moreover, Plaintiffs allege that the Advisor Defendants breached their fiduciary duties by "recommending the 2023 Charter Amendments that were not in the shareholders['] best interests and disseminating or assisting in disseminating the 2022 Proxy Statements and the 2022 FAQs that were false, misleading[,] and/or incomplete." (*Id.* ¶ 136.)

As discussed above, a claim for breach of fiduciary duty requires a showing of: "[(1)] the existence of a fiduciary relationship; [(2)] [a] breach of the duty owed by the fiduciary to the

beneficiary; and [(3)] harm to the beneficiary." *Plank*, 231 A.3d at 466 (quoting *Froelich*, 96 F. Supp. 2d at 526).

Defendants argue that Plaintiffs failed to state a breach of fiduciary duty claim because "[a] majority of disinterested stockholders, with full knowledge of how their votes would affect the charters, [] approved the amendments." (Defs.' Moving Br. 13-14 (citations omitted).) As explained above, however, Plaintiffs have plausibly alleged that the stockholder ratification was not fully informed because it was based on Defendants' misleading half-truths and omissions. Moreover, Plaintiffs have pled facts sufficient to state a cause of action for the Advisor Defendants' breach of fiduciary duty. *First*, Plaintiffs point to the Legacy Charters, which provide that "[t]he Advisor shall have a fiduciary responsibility and duty to the Company and to the Stockholders." (Ex. 1 to FAC *23, ECF No. 14-1.[5]) *Second*, Plaintiffs allege that the Advisor Defendants breached those duties by failing to disclose that Lichtenstein, who owned the Lightstone Advisors, would not have received a liquidating distribution if the REITs liquidated within the timeframe required by the Legacy Charters. (FAC ¶ 71.) *Third*, Plaintiffs allege that they "have not and will not be able to liquidate their shares for fair value" and "have suffered and continue to suffer a diminution

---

[5] Plaintiffs incorporated the Legacy Charter in the FAC, which allows the Court to consider these documents on a motion to dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (noting that a court may consider a "document *integral to or explicitly relied* upon in the complaint," without converting a motion to dismiss into a motion for summary judgment (citation omitted)); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (explaining that a court may also consider "items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case" (alteration in original) (citation omitted)).

Page numbers preceded by an asterisk refer to the number atop the ECF header.

in the value of their shares."[6] (FAC ¶ 140.) The Court therefore denies Defendants' Motion to Dismiss Count Two of the FAC.

**D. Count Three — Declaratory Relief**

Defendants argue that Count Three should be dismissed because "Maryland law exculpates directors for corporate acts ratified by stockholder vote." (Defs.' Moving Br. 12.) A court may grant a declaratory judgment in a civil case:

> [I]f it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
>
> (1) An actual controversy exists between contending parties;
>
> (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
>
> (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

Md. Code Ann., Cts. & Jud. Proc. § 3-409(a). Moreover, a party may obtain a declaratory judgment "notwithstanding a concurrent common-law, equitable, or extraordinary legal remedy[.]" *Id.* § 3-409(c). A justiciable controversy is an "absolute prerequisite to the maintenance of a declaratory judgment action." *Daljaco, Inc. v. Baugh*, 348 A.3d 914, 924 (Md. App. Ct. 2025) (quoting *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 92 A.3d 400, 483 (Md. 2014)). For a declaratory judgment claim to survive a Rule 12(b)(6) motion, the test is "whether [plaintiffs are] entitled to a declaration at all; so, even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a

[6] Because the measure of damages presents a fact-intensive inquiry, the Court need not resolve that issue at the motion to dismiss stage. *See Berman v. ADT LLC*, No. 12-7705, 2013 WL 6916891, at *8 (D.N.J. Dec. 13, 2013) ("It is inappropriate for the Court to wade into factual issues, such as the measure of Plaintiffs' damages, on a motion to dismiss.").

declaratory decree." *Allied Inv. Corp v. Jasen*, 731 A.2d 957, 961 (Md. 1999) (quoting *Shapiro v. Bd. of Cnty. Comm'rs*, 149 A.2d 396, 399 (Md. 1959)). As such, "the only place a [dismissal] has in the declaratory process is to challenge the legal availability of the remedy sought to be used." *Id.* (alteration in original) (citation omitted). Because Defendants' only argument opposing declaratory relief is that stockholder ratification exculpates them, and because Plaintiffs have otherwise stated a claim upon which relief may be granted, Defendants' Motion to Dismiss Count Three is denied.

**E. Count Four — Breach of Contract**

Defendants argue that Count Four should be dismissed because "Plaintiffs . . . do not specifically allege what actions constituted a breach," and instead "state generally that Defendants['] conduct as alleged . . . breached the Legacy Charters." (Defs.' Moving Br. 28 (internal quotation marks omitted).) In Maryland, a complaint alleging a breach of contract must "allege with certainty and definiteness [(1)] facts showing a contractual obligation owned by the defendant to the plaintiff[;] and [(2)] a breach of that obligation by the defendant." *Cont'l Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 369 A.2d 566, 569 (Md. 1977). "In a breach of contract action, the plaintiff need not prove damages resulting from the breach." *Ambling Mgmt. Co. v. Univ. View Partners, LLC*, 581 F. Supp. 2d 706, 718 (D. Md. 2008) (citing *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001); *Hooton v. Kenneth B. Mumaw Plumbing & Heating Co.*, Inc., 318 A.2d 514, 518 (Md. 1974)).

Here, Plaintiffs have adequately alleged both a contractual obligation and a breach of that obligation. Plaintiffs allege that the Lightstone REITs incorporated provisions from the North American Securities Administrators Association ("NASAA"). (FAC ¶¶ 151-152.) One such provision required that the Directors "be deemed to be in a fiduciary relationship to the REIT and

the SHAREHOLDERS. The TRUSTEES of the REIT shall also have a fiduciary duty to the SHAREHOLDERS to supervise the relationship of the REIT with the ADVISOR." (*Id.* ¶ 41(b) (citing NASAA REIT Guidelines ¶ II(E)).) Because those fiduciary obligations were embodied in the Legacy Charters (*id.* ¶ 152), Plaintiffs have sufficiently pled a contractual obligation owed to Plaintiffs by Defendants. *See Yarn v. Hamburger L. Firm, LLC*, No. 12-3096, 2013 WL 5375462, at *8 (D. Md. Sep. 24, 2013) (finding that plaintiffs "adequately alleged a contractual duty" where the complaint generally alleged the nature of the contractual arrangement between the parties); *Democracy Cap. Corp. v. Abacos Cap., LLC*, No. 25-2083, 2026 WL 874109, at *5 (D. Md. Mar. 31, 2026) (noting that "to state a claim for breach of contract, 'a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff'" and that plaintiff adequately alleged that such a contractual obligation existed where plaintiff generally alleged the terms of the contract (citation omitted)); *Franzoy v. Yockey*, 695 F. Supp. 3d 696, 699 (D. Md. 2023) (finding that plaintiffs adequately alleged the existence of contractual obligations where they specifically alleged what defendants agreed to do).

Moreover, because the Court already has found that Plaintiffs adequately alleged a breach of fiduciary duty, Plaintiffs likewise adequately allege breach of the corresponding contractual obligation.[7] The Court therefore denies Defendants' Motion to Dismiss Count Four of the FAC.

---

[7] Plaintiffs also allege that Defendants violated the implied covenant of good faith and fair dealing. (FAC ¶ 155.) For substantially the same reasons as stated in the August 2025 Opinion, those allegations remain insufficient. (*See generally* Aug. 2025 Op.) Without further factual allegations, the Court cannot draw a reasonable inference as to how Plaintiffs were unable to perform their obligations under the Legacy Charters or did not receive the benefit of their bargain. *See Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992); *see also Twombly*, 550 U.S. at 545. To the extent that Count Four relies on a theory that Defendants violated the implied covenant of good faith and fair dealing, the Court explicitly rejects such a theory.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is denied. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: ~~July~~ August 4, 2026 __, 2026